[Cite as *State v. Krieger*, 2025-Ohio-5063.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30324 |
| Appellee | : | |
| | : | Trial Court Case No. 2023 CR 02405 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| MICHAEL DAVID KRIEGER SR. | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on November 7, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
ROBERT G. HANSEMAN, JUDGE

LEWIS, J., and HUFFMAN, J., concur.

JOHNNA M. SHIA, Attorney for Appellant
TRISTAN D. DIEGEL, Attorney for Appellee

HANSEMAN, J.

{¶ 1} Appellant Michael David Krieger Sr. appeals from his convictions for involuntary manslaughter and having weapons while under disability following a jury trial and a bench trial in the Montgomery County Court of Common Pleas. In support of his appeal, Krieger claims that the trial court erred by failing to suppress statements he made to law enforcement officers based on alleged violations of his *Miranda* rights. Krieger also claims that the trial court erred by making him choose between having the jury instructed on the defense of accident or the lesser-included offense of involuntary manslaughter. In addition, Krieger claims that his trial counsel provided ineffective assistance by choosing the involuntary manslaughter instruction. Krieger further claims that his conviction for involuntary manslaughter was not supported by sufficient evidence and was against the manifest weight of the evidence. Lastly, Krieger claims that his involuntary manslaughter and having weapons while under disability offenses are allied offenses of similar import that the trial court should have merged at sentencing. For the reasons outlined below, we disagree with Krieger's claims and will affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On August 21, 2023, a Montgomery County grand jury returned a seven-count indictment charging Krieger with two counts of felony murder in violation of R.C. 2903.02(B) (proximate cause felonious assault), one count of felonious assault in violation of R.C. 2903.11(A)(1) (serious physical harm), one count of felonious assault in violation of

R.C. 2903.11(A)(2) (deadly weapon), and three counts of having weapons while under disability in violation of R.C. 2923.13(A)(3) (prior felony drug conviction). All the counts for felony murder and felonious assault included three-year firearm specifications.

{¶ 3} The indicted charges and specifications stemmed from allegations that during the early morning hours of August 12, 2023, Krieger shot and killed Donavan Sampson with a nine-millimeter firearm while Sampson and his friend, Jeffrey Cox, were visiting Krieger's residence in Dayton, Ohio. Krieger pled not guilty to the charges and filed a motion to suppress his statements to law enforcement officers based on alleged violations of his *Miranda* rights. On January 19, 2024, the trial court held a hearing on Krieger's motion to suppress. Following the hearing, the trial court overruled the motion. Krieger's case then proceeded to a three-day jury trial on the felony murder and felonious assault charges. Krieger waived his right to a jury trial for the three counts of having weapons while under disability and thus chose to have those counts tried to the bench.

{¶ 4} The evidence presented at Krieger's jury trial established that on the night of August 11, 2023, Sampson and Cox went to Krieger's residence and stayed there into the early morning hours of August 12, 2023. Cox knew Krieger through his uncle and had been to Krieger's residence before. Sampson, however, did not know Krieger and met him for the first time on the night in question. Cox was planning to spend the night at Krieger's residence due to Cox being in an argument with his live-in girlfriend. Sampson drove Cox to Krieger's residence and decided to hang out there. While at Krieger's residence, Sampson, Cox, and Krieger drank beer, smoked marijuana, listened to music, and conversed with one another.

{¶ 5} Cox testified that he was sitting on Krieger's living room couch next to Sampson when Krieger left the living room and then returned to where he and Sampson were sitting. Cox testified that he was looking down at his cellphone and not paying attention to what was

3

going on. While he was looking down at his cellphone, Cox heard a "loud pop." Trial Tr. Vol. II, p. 199. Thereafter, Cox looked over and saw that Sampson had been shot and was grabbing himself. Cox heard Sampson say: "[W]hy is he killing me?" *Id*. Cox then noticed that Krieger had a gun in his hand. Cox testified that he became scared and proceeded to hit Krieger five or six times until Krieger was unconscious. Cox testified that he grabbed the firearm from Krieger, threw the firearm in Krieger's front yard, and then called 9-1-1 for help.

{¶ 6} After Cox called 9-1-1, several officers responded to Krieger's residence. The responding officers found Krieger lying face down on his bedroom floor and noticed that he was heavily intoxicated. The responding officers also found Sampson on Krieger's couch. Medics arrived at the scene and took Sampson to the hospital, where he died.

{¶ 7} The coroner who performed Sampson's autopsy testified that Sampson's blood-alcohol content was over the legal limit and that his cause of death was a gunshot wound to the left chest. In addition, the coroner testified that there was burnt gunpowder and a partial muzzle imprint around the gunshot wound. Based on those observations, the coroner testified that Sampson had suffered a "contact wound." Trial Tr. Vol. II, p. 168. The coroner explained that this meant the muzzle of the firearm had been pressed up against Sampson's skin. The coroner further testified that the bullet traveled downward and exited out of Sampson's left, lower back.

{¶ 8} After finding Krieger at the scene of the shooting, officers placed Krieger in the back of a police cruiser and took him to the hospital. Krieger, who suffered a broken jaw at the hands of Cox, remained at the hospital for two days before being released. Immediately after Krieger was released from the hospital, an officer transported him to the Dayton Police Department's Safety Building for an interview with an investigating detective. During the

4

interview, Krieger claimed that he was simply showing his firearm to Sampson when it accidentally discharged.

{¶ 9} Krieger testified that he knew his firearm was loaded when he showed it to Sampson and that he had mistakenly thought he activated the safety feature on the firearm. Krieger admitted to reflexively pulling the trigger but denied placing the firearm against Sampson's chest. According to Krieger, he was standing at least four feet away from Sampson when the weapon accidentally discharged. Krieger also testified to drinking strong beer and using marijuana on the night of the shooting.

{¶ 10} Both Cox and Krieger testified that there were no arguments or any tension between Sampson and Krieger prior to the shooting. Both men testified that everyone was getting along at Krieger's residence.

{¶ 11} For Krieger's jury trial, the parties stipulated that Krieger had been previously convicted of aggravated possession of drugs, a felony of the third degree, in Greene County Court of Common Pleas Case No. 2020-CR-562. *See* Joint Exhibit II. For Krieger's bench trial, the parties stipulated that Krieger had three prior felony convictions in the Montgomery County Court of Common Pleas for possession of cocaine (Case No. 2007-Ohio-4400) and aggravated possession of drugs (Case Nos. 2018-CR-2120/2 and 2019-CR-2906). *See* Joint Exhibit III.

{¶ 12} During his jury trial, Krieger moved for a Crim.R. 29 acquittal of the felony murder and felonious assault charges. The trial court denied the motion and Krieger thereafter requested jury instructions on the defense of accident and the lesser-included offense of involuntary manslaughter predicated upon the offense of having weapons while under disability. After considering Krieger's request, the trial court determined that it was legally inappropriate to give both the accident and involuntary manslaughter instructions.

5

As a result, the trial court made Krieger choose between having the jury instructed on accident or involuntary manslaughter. In response, Krieger chose to have the jury instructed on involuntary manslaughter.

{¶ 13} Following deliberations, the jury found Krieger not guilty of felony murder and felonious assault. The jury did, however, find him guilty of involuntary manslaughter as a lesser-included offense of the two counts of felony murder. The trial court thereafter held a bench trial and found Krieger guilty of all three indicted counts of having weapons while under disability.

{¶ 14} At sentencing, the trial court merged the two counts of involuntary manslaughter and their attendant firearm specifications. The trial court also merged the three counts of having weapons while under disability. Following the merger, Krieger was sentenced to a single count of involuntary manslaughter with a firearm specification and a single count of having weapons while under disability. For involuntary manslaughter, the trial court imposed an indefinite, mandatory minimum term of 11 years to a maximum term of 16.5 years in prison, plus three years in prison for the attendant firearm specification. For having weapons while under disability, the trial court imposed 36 months in prison to be served concurrently with the sentence for involuntary manslaughter. Accordingly, Krieger's total, aggregate sentence was a mandatory minimum term of 14 years to a maximum term of 19.5 years in prison.

{¶ 15} Krieger now appeals from his convictions, raising five assignments of error for review. For purposes of clarity, we will address Krieger's third and fourth assignments of error out of order.

6

**First Assignment of Error**

{¶ 16} Under his first assignment of error, Krieger contends that the trial court erred by denying his motion to suppress. Specifically, Krieger claims that the trial court should have suppressed statements he made to law enforcement officers on the morning of the shooting because he was not *Mirandized* and because he made the statements while he was severely injured and heavily intoxicated. Krieger also claims that the trial court should have suppressed statements he made to a detective two days after the shooting. Krieger claims that those statements should have been suppressed because they were made just after he was released from the hospital while he was "likely" on pain medication. Although Krieger admits that the detective read him his *Miranda* rights and presented him with a *Miranda* waiver form that he read and signed, Krieger suggests that, given his mental and physical condition, he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights.

*Standard of Review*

{¶ 17} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. When ruling on a motion to suppress, "the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id*., citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id*., citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id*., citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist. 1997).

7

*The Trial Court's Findings of Fact*

**{¶ 18}** The trial court made the following findings of fact after hearing testimony from Officer Robert Lyons, Officer Cayce Cantrell, and Detective Zarchary Farkas of the Dayton Police Department, and after reviewing video footage from the body and cruiser cameras of Officers Lyons and Cantrell.

On August 12, 2023, Officer Lyons was working with his partner Officer Moreland when they responded to a report of a shooting at . . . Leo Street in Dayton. A witness later identified as Jeffrey Cox was outside of the house when the officers arrived. The officers found a gun in the grass, which they cleared before entering the home. Upon entering, they observed [Donovan Sampson] laying on a couch in the living room shot and bleeding profusely. The officers then located Mr. Krieger in a bedroom located directly to the right of the living room. Mr. Krieger was escorted from the home and placed into the back of a police cruiser. Officer Lyons testified that Mr. Krieger was not free to leave upon being placed into the cruiser. Officer Lyons did not observe that Mr. Krieger had any injuries, but later found out that he had missing teeth and a broken jaw. The officers believed that Mr. Krieger was under the influence of alcohol because he could not stand on his own, was slurring his speech and "was not making any sense" when he was speaking. Neither Officer Lyons nor Officer Moreland asked Mr. Krieger any questions regarding the incident, but they did ask Mr. Krieger for his personal identifiers and if he needed medical attention for any injuries.

Det. Farkas arrived on scene about 45 minutes after the officers arrived. At this time, Mr. Cox was detained in a cruiser. Det. Farkas learned that Mr.

8

Cox assaulted Mr. Krieger in order to gain control of a firearm that Mr. Krieger had. Det. Farkas could smell the odor of alcohol and observed that Mr. Krieger appeared heavily intoxicated. During this portion of the encounter, Det. Farkas did not question Mr. Krieger about the shooting or any events that occurred inside of the home, but he did ask questions to try and determine if Mr. Krieger needed medical attention. It was subsequently decided that Mr. Krieger would be taken to the hospital due to his injuries and his intoxication. Officers Lyon and Moreland then transported Mr. Krieger to Miami Valley Hospital (MVH). They did not ask him any questions about the shooting during the transport.

Mr. Krieger was admitted to MVH for several days during which time Officer Cantrell stood guard at the hospital. Upon Mr. Krieger's discharge on August 14, [2023,] Officer Cantrell transported him from the hospital to the Safety Building to be interviewed by Det. Farkas. She testified that they had "general conversation" during the transport but that she did not ask him any questions about the shooting. She was not present during his interview with Det. Farkas. Officer Cantrell testified that she was not aware of Mr. Krieger being under the influence of any substance, including any medications. She observed that he had a bit of difficulty speaking due to his jaw injury, but that his speech was clear. Specifically, she testified that he did not sound "incoherent" or "illogical."

Det. Farkas testified that his interview with Mr. Krieger lasted approximately 20-25 minutes. Before the interview commenced, Det. Farkas reviewed a *Miranda* rights advisement and waiver form with Mr. Krieger, which Mr. Krieger signed in the presence of Det. Farkas and Det. David House. (*See*

9

State's Ex. 1). Det. Farkas indicated that nothing occurred during the interview that led him to believe that Mr. Krieger was on pain medication, but he acknowledged that he did not review any medical records or lab reports before speaking with Mr. Krieger. Due to the nature of Mr. Krieger's injuries he assumed that Mr. Krieger was administered pain medication or muscle relaxers at the hospital, but Mr. Krieger appeared to understand the questions he was being asked and did not appear intoxicated. He described Mr. Krieger as coherent, cordial, and respectful. Det. Farkas made no threats or promises during the interview and Mr. Krieger did not ask for an attorney or ask to stop the interview.

Following the interview, Officer Cantrell transported Mr. Krieger back to MVH to have an IV port removed. Thereafter, she transported him to the Montgomery County Jail. Officer Cantrell did not ask Mr. Krieger any questions during the transport.

Decision, Entry and Order Denying Defendant's Motion to Suppress Statements (Mar. 18, 2024), p. 2-4.

{¶ 19} Upon review, we find that the foregoing findings of fact made by the trial court are supported by competent, credible evidence in the record. Using those facts, we will independently apply the relevant law to determine whether the trial court correctly overruled Krieger's motion to suppress.

*Miranda Warnings Were Not Required on the Morning of the Shooting*

{¶ 20} As previously discussed, Krieger contends that the statements he made to law enforcement officers on the morning of the shooting should have been suppressed because he was not *Mirandized* and because he was severely injured and heavily intoxicated.

10

{¶ 21} "In [*Miranda v. Arizona*, 384 U.S. 436 (1966)], the United States Supreme Court outlined procedural safeguards needed for securing the privilege against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution." *State v. Hudson*, 2022-Ohio-3253, ¶ 30 (2d Dist.). "'*Miranda* requires police to give a suspect certain prescribed warnings before custodial interrogation commences and provides that if the warnings are not given, any statements elicited from the suspect through police interrogation in that circumstance must be suppressed.'" *Id.*, quoting *State v. Petitjean*, 140 Ohio App.3d 517, 523 (2d Dist. 2000). "Furthermore, if, after *Miranda* warnings are given, the suspect indicates that he or she wishes to remain silent, or if the suspect states that he or she wants an attorney, the interrogation must cease." *Id.*, citing *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010).

{¶ 22} "'Only a custodial interrogation triggers the need for a *Miranda* rights warning.'" *State v. Cobb*, 2025-Ohio-1274, ¶ 48 (2d Dist.), quoting *State v. Goodspeed*, 2004-Ohio-1819, ¶ 22 (2d Dist.). (Other citations omitted.) "Custodial interrogation is '"questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."'" *State v. Moody*, 2012-Ohio-3390, ¶ 12 (2d Dist.), quoting *State v. Roberts*, 32 Ohio St.3d 225, 226, fn. 1 (1987), quoting *Miranda* at 444.

{¶ 23} "'Interrogation' includes express questioning as well as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Strozier*, 2007-Ohio-4575, ¶ 20 (2d Dist.), quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *accord State v. Fair*, 2011-Ohio-3330, ¶ 40 (2d Dist.). "An officer's request for routine information necessary for basic identification purposes is not

11

interrogation unless the officer should have known that it was reasonably likely to elicit an incriminating response." *In re S.W.,* 2022-Ohio-854, ¶ 11, fn. 1 (1st Dist.), citing *United States v. Tapia-Rodriguez,* 968 F.3d 891, 894 (8th Cir. 2020) (asking suspect whether he lived in the apartment was a request for routine information and did not constitute interrogation under *Miranda*); *accord State v. Tompkins,* 1996 WL 612855, *5 (2d Dist. Oct. 25, 1996) ("[t]he police may ask 'routine booking questions,' such as requests for the suspect's name and address, as long as they are not likely to elicit incriminating responses"), quoting *Pennsylvania v. Muniz,* 496 U.S. 582, 601 (1990); *State v. Mendenhall,* 1990 WL 34860, *3 (9th Dist. Mar. 28, 1990) ("the taking of basic personal information such as name, age and place of birth is a ministerial duty incident to arrest and custody which does not constitute 'interrogation or its functional equivalent, "reasonably likely to elicit an incriminating response"'), quoting *United States v. Taylor,* 799 F.2d 126, 128 (4th Cir. 1986), quoting *Innis* at 301-02; *State v. Miller,* 2018-Ohio-4898, ¶ 33 (8th Dist.); *State v. Velliquette,* 2020-Ohio-4855, ¶ 16 (6th Dist.).

{¶ 24} In this case, there is no dispute that Krieger was in custody when he was placed in the back of a police cruiser on the morning of the shooting. However, the trial court found, and the video evidence confirms that none of the officers ever questioned Krieger about the shooting incident while he was in custody. Rather, the evidence established that the officers simply asked Krieger identification questions and questions about his injuries and whether he needed medical attention. Such questions were not reasonably likely to elicit an incriminating response; accordingly, they do not amount to an interrogation. Because there was no interrogation at the scene of the shooting, no *Miranda* warnings were required. Therefore, the officers' failure to *Mirandize* Krieger at the scene of the shooting does not warrant suppressing Krieger's statements. Although Krieger was injured and intoxicated, the

12

fact remains that the officers did not try to elicit any incriminating information from Krieger when he was in that state. Accordingly, there was no basis to suppress the statements Kieger made to officers on the morning of the shooting.

*Krieger's Miranda Waiver Was Valid*

{¶ 25} Krieger also claims that the statements he made to Detective Farkas two days after the shooting should have been suppressed because his *Miranda* waiver was not knowing, intelligent and voluntary due to his physical and mental condition.

{¶ 26} "[A] suspect may effectively waive the rights conveyed in the *Miranda* warnings only if the waiver is made voluntarily, knowingly and intelligently." *State v. Dailey*, 53 Ohio St.3d 88, 91 (1990), citing *Miranda,* 384 U.S. at 444. "Thus, a court may recognize the validity of a waiver of *Miranda* rights only if it finds that (1) 'the relinquishment of the right[s] [was] voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]' and (2) the person had 'a full awareness of both the nature of the right[s] being abandoned and the consequences of the decision to abandon [them].'" *State v. Marejka*, 2018-Ohio-2570, ¶ 14 (2d Dist.), quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

{¶ 27} "Courts examine the totality of the circumstances to determine whether a suspect has knowingly, intelligently, and voluntarily waived his or her *Miranda* rights." *State v. White*, 2018-Ohio-3076, ¶ 17 (2d Dist.), citing *State v. Clark*, 38 Ohio St.3d 252, 261 (1988). When considering the totality of the facts and circumstances, we look at "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31 (1976), paragraph two of the syllabus, *overruled on other grounds*, 438 U.S. 911 (1978); *accord State v. Verdell*, 2018-

13

Ohio-4766, ¶ 32 (2d Dist.). That said, a written waiver of rights is strong proof that a waiver is valid. *Clark* at 261, citing *North Carolina v. Butler*, 441 U.S. 369 (1979).

**{¶ 28}** In this case, Keiger was 62 years old and had several prior felony drug convictions at the time he was interrogated by Detective Farkas. During the interrogation, Detective Farkas read Krieger his *Miranda* rights and Krieger signed a written waiver of those rights before he was questioned. The video evidence confirms that Krieger never asked for an attorney nor indicated that he did not want to proceed with the interrogation. Instead, Krieger read and signed the *Miranda* waiver and voluntarily proceeded with the interrogation without any threats or coercion by Detective Farkas. At all times during the interrogation, Detective Farkas was friendly and accommodating. Detective Farkas was also unarmed, and he only questioned Krieger for approximately 20-25 minutes.

**{¶ 29}** Although Detective Farkas interrogated Krieger immediately after Krieger was released from the hospital, the video evidence established that Krieger was alert, coherent, and cordial during the interrogation. Indeed, Krieger's behavior during the interrogation was very different from the intoxicated behavior that Krieger displayed while he was at the scene of the shooting. During the interrogation, Krieger appeared to understand the questions being asked of him and gave appropriate responses. Although Detective Farkas noted that Krieger's jaw injury affected his speech, Krieger still spoke clearly and coherently. At the time of the interrogation, Krieger did not claim to be intoxicated, nor did he engage in any behavior that indicated his ability to reason was impaired.

**{¶ 30}** Even if we were to assume that Krieger was on pain medication at the time of the interrogation, it is well established that "'[i]ntoxication will not render a defendant's waiver of his *Miranda* rights invalid unless his ability to reason is sufficiently impaired.'" *State v. Sellars*, 2020-Ohio-2853, ¶ 27 (2d Dist.) citing *Verdell*, 2018-Ohio-4766 at ¶ 34 (2d Dist.).

14

*See also State v. Sitzes*, 2023-Ohio-3915, ¶ 21 (2d Dist.) ("[e]vidence of intoxication . . . is not dispositive of whether a suspect has made a valid waiver, but rather is part of the consideration of the totality of circumstances"). In this case, there is no evidence of impairment that would indicate Krieger did not have the requisite level of comprehension to fully understand the nature of the rights he was waiving and the consequences of the waiver.

**{¶ 31}** Because the totality of the circumstances establish that Krieger voluntarily chose to waive his *Miranda* rights without any coercion, intimidation or deception, and because Krieger's behavior established that he was lucid and that he comprehended what was going on during the waiver and questioning process, we find that the trial court did not err by failing to suppress the statements Krieger made to Detective Farkas.

**{¶ 32}** Krieger's first assignment of error is overruled.

**Second Assignment of Error**

**{¶ 33}** Under his second assignment of error, Krieger claims that the trial court erred by making him choose between having the jury instructed on the defense of accident or the lesser-included offense of involuntary manslaughter. According to Krieger, the trial court should have given both instructions to the jury or it should have refrained from giving the involuntary manslaughter instruction by itself.

*Standard of Review*

**{¶ 34}** "When reviewing the trial court's jury instructions, the proper standard of review is whether the trial court's decision to give or exclude a particular jury instruction was an abuse of discretion under the facts and circumstances of the case." *State v. Fair*, 2011-Ohio-4454, ¶ 65 (2d Dist.), citing *State v. Hamby*, 2010-Ohio-4040, ¶ 13 (2d Dist.). "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable,

or arbitrary." (Citation omitted.) *State v. Darmond*, 2013-Ohio-966, ¶ 34. An abuse of discretion "most often involves an 'unreasonable' decision that is not supported by a sound reasoning process." (Citations omitted.) *State v. Mackey*, 2018-Ohio-516, ¶ 8 (2d Dist.); *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). Absent an abuse of discretion, we will not reverse the decision of the trial court.

*Law and Analysis*

{¶ 35} "Under Crim.R. 30(A), a trial court has a mandatory duty to provide the jury with all relevant and necessary instructions." *Cobb*, 2025-Ohio-1274, ¶ 39 (2d Dist.), citing *State v. Pettiford*, 2019-Ohio-892, ¶ 26 (2d Dist.). In doing so, "the trial court must give a correct jury instruction on the elements of the offense charged and all defenses raised by the evidence." *State v. Woullard*, 2004-Ohio-3395, ¶ 46 (2d Dist.), citing *State v. Williford*, 49 Ohio St.3d 247 (1990). A criminal defendant is also "sometimes entitled to a jury instruction that allows the jury to consider convicting the defendant of a lesser included offense as an alternative to convicting for the offense for which the defendant was charged." *State v. Owens*, 2020-Ohio-4616, ¶ 8, citing *State v. Thomas*, 40 Ohio St.3d 213, 216-218 (1988). As relevant to this case, involuntary manslaughter is a lesser-included offense of felony murder. *State v. Blanton*, 2023-Ohio-89, ¶ 28 (2d Dist.), citing *State v. Rider*, 2022-Ohio-1964, ¶ 41 (2d Dist.), citing *Thomas* at 215.

{¶ 36} "Ordinarily, when a defendant presents a complete defense to the substantive elements of the crime . . . an instruction on a lesser included offense is improper." (Citation omitted.) *State v. Bethel*, 2006-Ohio-4853, ¶ 137. The theory of accident is an example of a complete defense. *State v. Underwood*, 3 Ohio St.3d 12, 14 (1983); *State v. Smith*, 2006-Ohio-4405, ¶ 24 (2d Dist.); *State v. Mitchell*, 2008-Ohio-958, ¶ 22 (8th Dist.); *State v. Rigdon*,

16

2007-Ohio-2843, ¶ 46 (12th Dist.). "Thus, when a defendant presents an accident defense, an instruction on involuntary manslaughter ordinarily is inappropriate." *State v. Wilson*, 2015-Ohio-2016, ¶ 47 (4th Dist.), citing *State v. Cutts*, 2009-Ohio-3563, ¶ 122 (5th Dist.) ("[w]here the theory of the defense is predicated on an accident . . . an instruction on involuntary manslaughter is inappropriate"); *State v. Mathis*, 2009-Ohio-3289, ¶ 17 (8th Dist.) ("an accident defense is incompatible with a request for a lesser included offense instruction on involuntary manslaughter").

{¶ 37} "Nevertheless, in certain circumstances a defendant presenting a complete defense may be entitled to a lesser included offense instruction." *Wilson* at ¶ 47, citing *State v. Wine*, 2014-Ohio-3948, ¶ 33. "In such cases, a defendant is entitled to a lesser-included-offense instruction 'only if, based on the evidence adduced by the state, the trier of fact can find for the defendant . . . on some element of the greater offense which is not required to prove the commission of the lesser offense and for the state on the elements required to prove the commission of the lesser offense.'" *Bethel* at ¶ 138, quoting *State v. Solomon*, 66 Ohio St.2d 214 (1981), paragraph two of the syllabus; *accord Wine* at ¶ 25; *State v. Wilkins*, 64 Ohio St.2d 382, 388 (1980). In other words, "even when a complete defense is offered by the defendant, if the state's evidence could be interpreted as supporting only a lesser included offense, a lesser-included-offense charge to the jury is appropriate[.]" *Wine* at ¶ 25. "Thus, . . . [an] accident defense does not necessarily preclude a lesser included offense instruction." *Wilson* at ¶ 47. "Instead, even when a defendant raises a complete defense, a lesser included offense instruction ordinarily is warranted "'if due to some ambiguity in the state's version of the events involved in [the] case the jury could have a reasonable doubt regarding the presence of an element required to prove the greater but not the lesser offense.'"" *Id.*, quoting *Wine* at ¶ 33, quoting *Solomon* at 221.

17

**{¶ 38}** In this case, Krieger was charged with two counts of felony murder in violation of R.C 2903.02(B) and two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2). Felony murder occurs when an offender "cause[s] the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" R.C. 2903.02(B). Krieger's two felonious assault charges were the predicate offenses of violence underlying his felony murder charges. An offender commits felonious assault under R.C. 2903.11(A)(1) and (A)(2) when he or she "knowingly" causes serious physical arm to another or "knowingly" causes or attempts to cause physical harm to another by means of a deadly weapon or dangerous ordnance.

**{¶ 39}** The defense of accident serves to negate the element of criminal culpability in the charged offenses. *State v. O'Dell*, 2009-Ohio-1040, ¶ 13 (2d Dist.), citing *State v. Poole*, 33 Ohio St.2d 18, 20 (1973). Therefore, the defense of accident in this case would serve to negate the knowingly element of felony murder/felonious assault, i.e., that Krieger knowingly caused Sampson serious physical harm/physical harm with a deadly weapon.

**{¶ 40}** Involuntary manslaughter occurs when the offender "cause[s] the death of another . . . as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A). It is almost identical to the offense of felony murder. *Blanton*, 2023-Ohio-89 at ¶ 29 (2d Dist.). The primary difference is that felony murder requires the underlying offense to be a first or second-degree felony offense of violence whereas involuntary manslaughter simply requires the underlying offense to be a felony. *Id*.; *State v. Rosales*, 2018-Ohio-197, ¶ 20 (2d Dist.). "'Involuntary manslaughter is a crime of transferred intent[,]'" meaning that "'the requisite culpable mental state is the same as the culpable mental state of the underlying [felony] offense.'" *State v. White* 2023-Ohio-4092, ¶ 52

18

(11th Dist.), quoting *State v. Leffel*, 2019-Ohio-1840, ¶ 17 (11th Dist.); *State v. Bayes*, 2000 WL 1879101, *3 (2d Dist. Dec. 29, 2000).

{¶ 41} In this case, the underlying felony offense for involuntary manslaughter was having weapons while under disability in violation of R.C. 2923.13(A)(3). A person violates R.C. 2923.13(A)(3) by knowingly acquiring, having, carrying, or using any firearm after having been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse. "Thus, if an offender uses a firearm in violation of the weapons-while-under-disability statute and the offender's use of that firearm proximately results in the death of another, the elements of involuntary manslaughter are satisfied." *State v. Crawford*, 2022-Ohio-1509, ¶ 16.

{¶ 42} Krieger would be entitled to a jury instruction on the defense of accident *and* the lesser-included offense of involuntary manslaughter only if the state's evidence was ambiguous on an element of felony murder/felonious assault that was not required to prove involuntary manslaughter. *See Wine*, 2014-Ohio-3948 at ¶ 33. With that in mind, we note that Krieger testified that he accidentally shot Sampson and that he was simply showing Sampson his firearm when it discharged. Krieger also testified that he reflexively pulled the trigger of the firearm while mistakenly believing that the safety feature on the weapon was activated. Both Krieger and Cox testified that Krieger and Sampson had been getting along at Krieger's residence and that there were no arguments or any tension between Sampson and Krieger before the shooting. Cox also testified that he did not see how the shooting happened. The evidence, therefore, was ambiguous as to whether Krieger *knowingly* caused Sampson serious physical harm/physical harm with a deadly weapon.

{¶ 43} Because of the aforementioned ambiguity, the trial court should have realized that it was possible for the jury to find that the knowing element of felony murder/felonious

19

was not proven. Under that circumstance, Krieger could not be convicted of felony murder, but he still could be convicted of the lesser-included offense of involuntary manslaughter. This is because involuntary manslaughter does not require Krieger to knowingly cause Sampson physical harm. Instead, Krieger had to knowingly possess a weapon while under disability—an act which Krieger admitted to at trial. Put simply, the jury could have had a reasonable doubt regarding the presence of an element required to prove the greater offense of felony murder but not the lesser offense of involuntary manslaughter. Because of this, we find that it would have been appropriate for the trial court to instruct the jury on both the defense of accident and the lesser-included offense of involuntary manslaughter.

{¶ 44} The defense of accident would only apply to the charged offenses of felony murder/felonious assault and not to the lesser-included offense of involuntary manslaughter. This is because applying the defense of accident would negate the culpable mental state and result in finding that Krieger did not knowingly possess a firearm while under a weapons disability. Such a conclusion is not supported by the record, as Krieger admitted to having a prior felony drug conviction and to knowingly possessing the firearm while he was under a weapons disability. In other words, Krieger's defense was not that he accidentally possessed a weapon while under disability, but rather that he accidentally shot Sampson. Accordingly, it would have been inappropriate for the trial court to apply the defense of accident to involuntary manslaughter. However, this court has previously recognized that both accident and involuntary manslaughter instructions can be given by fashioning instructions that avoid "misleading the jury into thinking that accident would also have been a defense to the lesser-included offense of Involuntary Manslaughter, upon which it was also instructed." *State v. Bethley*, 1998 WL 226379, *3 (2d Dist. May 8, 1998).

20

{¶ 45} All that being said, even if we were to find that the trial court had abused its discretion by failing to instruct the jury on both accident and involuntary manslaughter, the fact remains that, even absent the accident instruction, the jury acquitted Krieger of the felony murder and felonious assault charges and instead found him guilty of involuntary manslaughter. Because the defense of accident only applied to the acquitted charges and not to involuntary manslaughter, it cannot be said that the outcome of Krieger's trial would have been any different had the accident instruction been given with the involuntary manslaughter instruction. Accordingly, Krieger was not prejudiced by the trial court's failure to provide an accident instruction, meaning that any error resulting from that failure is harmless. *State v. Sibole*, 2018-Ohio-3203, ¶ 12 (2d Dist.) ("[a]n error may be disregarded as harmless error if a defendant has not suffered any prejudice as a result"), citing *State v. Morris*, 2014-Ohio-5052, ¶ 25; *State v. Snyder*, 2000 WL 731777, *2 (2d Dist. June 9, 2000) ("[p]ursuant to the 'harmless error' rule, a judgment will not be reversed on the basis of an error which does not materially prejudice the complaining party").

{¶ 46} Krieger also argues that the trial court should not have given the involuntary manslaughter instruction by itself. Krieger, however, specifically requested the trial court to give that instruction to the jury. Under the invited error doctrine, a party may not request a jury instruction and then later complain on appeal that requested instruction was given. *State v. Brown*, 2013-Ohio-3608, ¶ 53 (5th Dist.); *State v. Armstrong-Carter*, 2021-Ohio-1110, ¶ 30 (2d Dist.) (holding that the appellant may not challenge a jury instruction given by the trial court that the appellant requested the trial court to give).

{¶ 47} Krieger's second assignment of error is overruled.

21

**Fourth Assignment of Error**

{¶ 48} Under his fourth assignment of error, Krieger claims that his trial counsel provided ineffective assistance by choosing to have the jury instructed on the lesser-included offense of involuntary manslaughter as opposed to the defense of accident. In doing so, Krieger claims that his counsel prejudiced him by abandoning his accident defense and by presenting a lesser-included offense that required the jury to hear evidence pertaining to his prior felony drug convictions.

{¶ 49} This court reviews alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, (1984), which has been adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, (1989). Pursuant to those cases, in order to prevail on an ineffective assistance claim, Krieger must show that his trial counsel rendered deficient performance and that counsel's deficient performance prejudiced him. *Strickland* at paragraph two of the syllabus; *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 50} To establish deficient performance, Krieger must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id*. at 688. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson*, 2005-Ohio-6143, ¶ 29 (2d Dist.), citing *Strickland*.

22

{¶ 51} To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Bradley* at 142, quoting *Strickland* at 694.

{¶ 52} In reviewing ineffective assistance claims, we will not second-guess trial strategy decisions. *State v. Mason*, 82 Ohio St.3d 144, 157 (1998); *Strickland* at 689. Therefore, "'trial counsel is allowed wide latitude in formulating trial strategy.'" *State v. Collins*, 2011-Ohio-4475, ¶ 15 (2d Dist.), quoting *State v. Olsen*, 2011-Ohio-3420, ¶ 121 (2d Dist.). "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, ¶ 56 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524-525 (1992). For example, "'[i]n a case in which there is conflict in the testimony and the defendant has a reasonable hope that the jury will believe his evidence and return a verdict of not guilty, it is a matter of trial strategy whether to seek to have the jury instructed concerning a lesser-included offense, or not to seek such an instruction and to hope for an acquittal.'" *Id.* at ¶ 34, quoting *State v. Catlin*, 56 Ohio App.3d 75, 78-79, (2d Dist. 1990). In other words, "[w]hether to request a lesser-included offense instruction, or to seek an acquittal based on an 'all or nothing' approach has been considered a matter of trial strategy." *State v. McDonald*, 2017-Ohio-8496, ¶ 61 (2d Dist.).

{¶ 53} In this case, although there was some evidence supporting the notion that Krieger had accidentally shot Sampson, there was also evidence suggesting otherwise. For example, the evidence established that Krieger had placed the barrel of his firearm directly against Sampson's chest when it discharged. The evidence also established that Krieger

23

knew the firearm was loaded when he showed it to Sampson and that he reflexively pulled the trigger. The evidence further established that Krieger's firearm was operating normally and that it had a normal trigger pull weight. In addition, Cox testified that after Krieger pulled the trigger, Sampson said, "why is he killing me?" Trial Tr. Vol. II, p. 199.

{¶ 54} Based on the aforementioned evidence, Krieger's trial counsel could have been concerned that the jury would not believe that Krieger had accidentally shot Sampson. Krieger's trial counsel also could have been concerned that if the jury was only presented with the all-or-nothing option of felony murder/felonious assault, that the jury would return a guilty verdict on those offenses regardless of the accident defense. By choosing to have the jury instructed on the lesser-included offense of involuntary manslaughter, we presume that Krieger's trial counsel was trying to avoid the risk of the jury finding Krieger guilty of the charged offenses by placing another option on the table for the jury to consider – an option that did not carry a potential life sentence. Counsel's decision in that regard is a matter of trial strategy that cannot support an ineffective assistance claim.

{¶ 55} We also note that counsel's strategy was successful in that the jury found Krieger not guilty of felony murder and felonious assault. It is pure speculation to say that the jury would have returned the same not-guilty verdict on the felony murder/felonious assault charges if the involuntary manslaughter instruction had not been given. Such "[s]peculation does not prove either prong under *Strickland*." *State v. Harris*, 2024-Ohio-99, ¶ 36 (2d Dist.), citing *State v. Morgan*, 2017-Ohio-7565, ¶ 54 ("speculation cannot prove prejudice"); *State v. Powell*, 2012-Ohio-2577, ¶ 86. Because Krieger failed to establish deficient performance on the part of his trial counsel and resulting prejudice, Krieger's ineffective assistance claim necessarily fails.

{¶ 56} Krieger's fourth assignment of error is overruled.

**Third Assignment of Error**

{¶ 57} Under his third assignment of error, Krieger contends that his conviction for involuntary manslaughter was not supported by sufficient evidence and was against the manifest weight of the evidence.

*Standards of Review*

{¶ 58} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id*.

{¶ 59} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "The fact that the evidence is subject to different

interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2014-Ohio-3432, ¶ 24 (2d Dist.), citing *Wilson* at ¶ 14.

*Law and Analysis*

{¶ 60} As previously discussed, Krieger was convicted for involuntary manslaughter in violation of R.C. 2903.04(A), which provides that "[n]o person shall cause the death of another . . . as a proximate result of the offender's committing or attempting to commit a felony."   The Supreme Court of Ohio has explained that this statute "requires two things for an involuntary-manslaughter conviction: (1) that a felony was committed and (2) that a person's death was a proximate result of the commission of that felony." *Crawford*, 2022-Ohio-1509, at ¶ 14.

{¶ 61} The felony underlying Krieger's involuntary manslaughter conviction was having weapons while under disability in violation of R.C. 2923.13(A)(3). Under that statute, "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance if . . . the person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse[.]" R.C. 2923.12(A)(3).

{¶ 62} "The term 'proximate result' as it is used in the definition of involuntary manslaughter resembles the concept of 'proximate cause' in that the defendant will be held responsible for those foreseeable consequences that are known to be, or should be known to be, within the scope of the risk created by his conduct." *State v. Bumgardner*, 1998 WL 892120, *8 (2d Dist. Aug. 21, 1998); *accord State v. Dixon*, 2002 WL 191582, *6 (2d Dist. Feb. 8, 2002); *Crawford* at ¶ 15. "[P]roximate result" is "a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience." (Citations omitted.) *Dixon* at *5.

26

{¶ 63} The Supreme Court of Ohio has explained that "[n]othing in the [involuntary manslaughter] statute requires any connection between the reason for the [weapons] disability and the death of the victim." *Crawford* at ¶ 14. The Supreme Court stated that: "it's of no consequence that the circumstances behind a firearm disability are unrelated to the cause of a victim's death. The foreseeable harm is what matters for proximate cause." (Citations omitted.) *Id.* at ¶ 16. "We are to ask the 'basic question that a proximate cause requirement presents': Does '"the harm alleged [have] a sufficiently close connection to the conduct" at issue'?" *Id.*, quoting *Robers v. United States*, 572 U.S. 639, 645 (2014), quoting *Lexmark Internatl., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). "Thus, if an offender uses a firearm in violation of the weapons-while-under-disability statute and the offender's use of that firearm proximately results in the death of another, the elements of involuntary manslaughter are satisfied." *Id.*

{¶ 64} In this case, the parties stipulated and Krieger testified to having a prior felony conviction for aggravated possession of drugs in 2020. Krieger also testified that as a result of his felony drug conviction, he was not allowed to possess a firearm, but that he "stupidly bought one" after he moved to a rough neighborhood. Trial Tr. Vol. III, p. 360. Thus, Krieger admitted to possessing a firearm while being under a weapons disability. In addition, Krieger admitted that, while he was under the weapons disability, he showed Sampson his firearm and shot Sampson by pulling the trigger of the firearm while mistakenly believing that the weapon's safety feature was activated. Testimony from the coroner who performed an autopsy on Sampson's body confirmed that Sampson died as result of the gunshot wound inflicted by Krieger.

{¶ 65} When viewing the aforementioned evidence in a light most favorable to the State, a rational factfinder could have concluded beyond a reasonable doubt that Krieger

27

shot and killed Sampson as a proximate result of him committing the felony offense of having weapons while under disability. Because such a finding encompasses all essential elements of involuntary manslaughter, we find that Krieger's conviction for involuntary manslaughter was supported by sufficient evidence.

{¶ 66} After reviewing the entire record and weighing all the evidence and reasonable inferences, we also find that the jury did not lose its way or create a manifest miscarriage of justice by finding Krieger guilty of involuntary manslaughter, as the weight of the evidence supported the jury's verdict. Accordingly, Krieger's conviction for involuntary manslaughter was not against the manifest weight of the evidence.

{¶ 67} Krieger's third assignment of error is overruled.

**Fifth Assignment of Error**

{¶ 68} Under his fifth assignment of error, Krieger claims that his involuntary manslaughter and having weapons while under disability offenses were allied offenses of similar import that the trial court should have merged at sentencing. Krieger bases this claim on the fact that having weapons while under disability was the predicate felony required for him to be found guilty of involuntary manslaughter. Krieger claims that those two offenses could not have been committed separately and therefore should have been merged as allied offenses of similar import.

*Standard of Review*

{¶ 69} "An appellate court typically reviews a trial court's merger determination de novo." *State v. Bierma*, 2024-Ohio-2089, ¶ 38 (2d Dist.), citing *State v. Williams*, 2012-Ohio-5699, ¶ 28. However, because Krieger failed to object to the trial court's merger determination at sentencing, all but plain error has been waived for appeal on that issue.

28

*State v. Bailey*, 2022-Ohio-4407, ¶ 7, citing *State v. Rogers*, 2015-Ohio-2459, ¶ 28. Accordingly, we will review the trial court's merger determination for plain error.

{¶ 70} "Plain error occurs when an error or defect at trial, not brought to the attention of the court, affects a substantial right of the defendant." *State v. Henderson*, 2020-Ohio-6, ¶ 29 (2d Dist.), citing *Rogers* at ¶ 22. "Plain error exists when but for the error the outcome of the trial clearly would have been otherwise." *Id*. "Courts must proceed on a claim of plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id*., quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of syllabus.

*Allied Offense Law*

{¶ 71} The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution prohibit a criminal defendant from being tried twice for the same offense and from receiving multiple punishments for the same offense. *State v. Pendleton*, 2020-Ohio-6833, ¶ 8, citing *State v. Ruff*, 2015-Ohio-995, ¶ 10. "The Ohio General Assembly enacted R.C. 2941.25 to help a court faced with sentencing a defendant on multiple offenses to determine whether the legislature intended to allow multiple punishments or whether those offenses should merge." *State v. Childs*, 2024-Ohio-4699, ¶ 63 (10th Dist.), citing *Pendleton* at ¶ 11, citing *State v. Brown*, 2008-Ohio-4569, ¶ 37. Therefore, when a defendant's conduct supports multiple offenses, sentencing courts apply the analysis set forth in R.C. 2941.25 to determine whether the offenses merge or whether the defendant may be convicted of separate offenses.

{¶ 72} R.C. 2941.25 provides the following:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or

29

information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 73} "'[W]hen determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions . . . (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?'" *State v. Earley*, 2015-Ohio-4615, ¶ 12, quoting *Ruff* at ¶ 31. "'An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.'" *Id*., quoting *Ruff* at ¶ 31.

{¶ 74} In *Early*, the Supreme Court of Ohio held that aggravated vehicular assault and operating a motor vehicle while under the influence of drugs or alcohol ("OVI") did not merge under the allied-offense statute even though the OVI offense served as the predicate conduct for the aggravated vehicular assault. *Early* at ¶ 21. In so holding, the court reasoned that aggravated vehicular assault "has a different import and significance" than OVI, such that "[t]here is a legitimate justification for criminalizing each of these offenses separately[.]" *Id*. at ¶ 15. Therefore, the Supreme Court concluded that misdemeanor OVI and felony aggravated vehicular assault "are offenses of dissimilar import and significance that are to be punished cumulatively." *Id*. at ¶ 20. Again, the Supreme Court reached that conclusion despite the fact that OVI was the predicate conduct for aggravated vehicular assault. "Thus,

we know from authority of the Supreme Court that there is . . . no overarching rule to the effect that where one offense is predicated on the commission of another, with the second essentially being an element of the first, the two must automatically merge at sentencing." *State v. McKnight*, 2022-Ohio-591, ¶ 33 (10th Dist.), citing *Ruff* at ¶ 28.

*Krieger's Offenses are Dissimilar in Import and Significance*

{¶ 75} Offenses are dissimilar in import or significance within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff*, 2015-Ohio-995 at ¶ 23. "[H]aving weapons while under disability is of a dissimilar import from other offenses 'because the statute manifests a legislative purpose to punish the act of possessing a firearm while under a disability separately from any offense committed with the firearm.'" *State v. Dalmida*, 2015-Ohio-4995, ¶ 32 (1st Dist.), quoting *State v. Bates*, 2015-Ohio-116, ¶ 30 (1st Dist.). "The underlying purpose of criminalizing having weapons while under disability is to protect the general public from the increased risk of harm of armed criminals." *Id*., citing *State v. Rice*, 69 Ohio St.2d 422, 427 (1982).

{¶ 76} In this case, it is clear that Sampson was the victim of Krieger's involuntary manslaughter offense and that the harm flowing from that offense was Sampson's death. In contrast, the harm flowing from Krieger having a weapon while under disability was not only Sampson being shot to death but also the safety risk that was posed to the general public while Krieger, a convicted felon, was in possession of a firearm. Indeed, Krieger told Detective Farkas that he had obtained the firearm four months prior to shooting Sampson; therefore, the general public was at risk of harm during the entire time that Krieger had the weapon. Because Krieger's offense involved separate and identifiable harms, they are dissimilar in import and significance.

*Krieger's Offenses Were Committed Separately*

**{¶ 77}** Offenses are committed separately within the meaning of R.C. 2941.25(B) if "one offense was complete before the other offense occurred, . . . notwithstanding their proximity in time *and that one was committed in order to commit the other*." (Emphasis added.) *State v. Turner*, 2011-Ohio-6714, ¶ 24 (2d Dist.). In other words, "when one offense is completed prior to the completion of another offense during the defendant's course of conduct, those offenses are separate acts." *State v. Mooty*, 2014-Ohio-733, ¶ 49 (2d Dist.), citing *Turner* at ¶ 24.

**{¶ 78}** As previously discussed, Krieger admitted to obtaining the firearm in question four months before shooting Sampson. There is no dispute that Krieger obtained the firearm while having prior felony drug convictions that prevented him from having a weapon. Accordingly, Krieger completed the offense of having weapons while under disability as soon as he obtained the firearm. Because Krieger committed the offense of having weapons while under disability four months before he shot Sampson, the offense of involuntary manslaughter was committed separately in time and also by separate conduct. *See State v. Shepard,* 2019-Ohio-3995, ¶ 51 (11th Dist.) ("[i]nvoluntary manslaughter and having a weapon while under disability do not appear to constitute allied offenses of similar import subject to merger since they involve separate conduct"), citing *State v. Allen,* 2017-Ohio-2831, ¶ 35 (9th Dist.) ("The fact that Allen had the gun at all while under disability was sufficient conduct to support that offense. His later failure to secure the gun and to allow his son access to it amounted to separate conduct").

**{¶ 79}** Because Krieger's involuntary manslaughter and having weapons while under disability offenses were dissimilar in import and significance and were committed separately, they are not allied offenses of similar import as defined under R.C 2941.25. Therefore, the

trial court did not commit any error, let alone plain error, by failing to merge those offenses at sentencing.

{¶ 80} Krieger's fifth assignment of error is overruled.

## Conclusion

{¶ 81} Having overruled all of Krieger's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

LEWIS, J., and HUFFMAN, J., concur.